Donald MADDY, Kurt Fredrick, Fredrick R. Shellhammer, III, Frank Michienzi, Mario Laureano, Anothony Chelpaty, William Madden, Steven Le Blanc, Jeffrey Scott Wilkerson, Jeffrey Navarette, Phillip Eric Benson, Bradley Palmer, Thomas Kiss, Individually, and on behalf of all others similarly situated, Plaintiffs,

v.

GENERAL ELECTRIC COMPANY, a New York corporation, Defendant.

Civil Action No. 14–0490 (JEI/KMW).

United States District Court, D. New Jersey.

Signed Nov. 14, 2014.

Swartz Swidler, LLC, by: Justin L. Swidler, Esq., Richard S. Swartz, Esq., NJ, Robert D. Soloff, P.A. by Robert D. Soloff, Esq., Allen Eichenbaum, Allen Eichenbaum, Esq., Plantation, FL, for Plaintiffs.

Littler Mendelson, P.C., by: Nina Markey, Esq., Rachel Fendell Satinsky, Esq., Aaron Reed, Esq. (pro hac vice), Daniel B. Boatright, Esq. (pro hac vice) Philadelphia, PA, for Defendant, General Electric Company.

## OPINION

IRENAS, Senior District Judge:

Plaintiffs bring this putative collective action pursuant to § 216(b) of the Fair Labor Standards Act ("FLSA") to recover allegedly unpaid overtime compensation from Defendant General Electric Company ("Defendant" or "GE").

Currently pending before the Court is Plaintiffs' motion for conditional collective action certification. For the reasons explained herein, Plaintiffs' motion is GRANTED.

## I. FACTS

The Court recites those facts relevant to deciding Plaintiff's pending motion for conditional certification.

**Scope of Employment**

Plaintiffs in this case are currently, or have worked as, service technicians for GE's Appliances Division, in a business segment called GE Consumer Home Service, since January 2011. (Plaintiff's Statement of Facts ("P.S.F.") ¶ 1; Defendant's Opposition ("Def. Opp.") at 2) GE's service technicians make service calls to customers' homes to repair GE appliances in 96 different "zones." (Def. Opp. at 2) These zones are further assigned to one of two regions—East or West. (*Id.*) Zones are supervised by 20 Consumer Service Managers ("CSMs"), who typically manage three to eight zones. (*Id.*) Defendant presently employs 900 service technicians. (*Id.*) Over the last three years, Defendant has employed approximately 1,200 service technicians across the 96 zones. (*Id.*)

In 42 of the zones, service technicians are represented by various unions though collective bargaining agreements ("CBAs"). (*Id.*) In the 54 non-union zones, service technicians participate in GE's "Solutions" alternative dispute resolution program. (*Id.*) As part of the Solutions program, non-union service technicians agree to resolve all disputes with GE through arbitration and to bring any claims against GE in an individual capacity only. (*Id.* at 2–3).

Service technicians receive an hourly wage, plus overtime for hours worked in excess of 40 per week, or as otherwise required by local law or applicable CBAs. (Declaration of Kristin Mathers ("Mathers Decl."), Ex. A to Def. Opp., at ¶ 10) The

procedures for notifying CSMs about and obtaining permission for overtime work vary across the different CSMs. (Def. Opp. at 6) Some CSMs require service technicians to ask for permission beforehand, while others ask only to be notified after service technicians work overtime. (*Id.*)

Service technicians self-report time worked on their company-issued laptops through an electronic time card system. (*Id.* ¶ 9) They record when they arrive at each service call and when each service call is completed. Defendant states that CSMs regularly direct service technicians to accurately report all working time. (Def. Opp. at 10).

During the relevant time period, GE's service technicians have operated under what Plaintiffs refer to as the Service Mobility System. Plaintiffs submitted an alleged "case study" of the system, which describes it as "management system for efficiently dispatching, scheduling, and communicating with operatives to boost efficiency and flexibility in delivering field services." (Service Mobility System Case Study, Ex. A to P.'s Memorandum of Law ("P.M.L.")) Service technicians connect to the system through their laptops, from which technicians can make and receive service calls, find information about the day's calls and necessary parts, and record work time.[1] (P.M.L. at 1) GE also provides service technicians with company vans, which can be tracked by GPS. (Def. Opp. at 12) Service technicians generally park these vans at their homes, though some use secure parking spots near their homes. (Def. Opp. at 4)

GE monitors the performance of service technicians through a Revenue Per Day ("RPD") metric. (Mather Decl. ¶ 13) RPD

---

1. Defendant does not dispute the features of the system Plaintiffs describe, but states that GE "does not typically refer to these various features collectively as a 'Service Mobility System.' " (Def. Opp. at 12).

measures the revenue a service technician produces relative to the number of hours the technician works each day. (*Id.*) GE sets RPD goals in each zone, which service technicians are expected to meet. (*Id.*) RPD goals vary from zone to zone, but range from $700 to $815. (*Id.*) According to Defendant, RPDs are designed to be challenging, but attainable. (Def. Opp. at 8) If a service technician does not meet his RPD goal, a CSM may place him on a formal Personal Improvement Plan ("PIP").[2] (*Id.* at 8–9) Plaintiffs state that the failure to improve after being placed on a PIP results in the termination of a service technician's employment. (P.S.F. ¶ 9)

John Wills, who manages the East Region of service technicians, states in his Declaration that service technicians are told that they need to perform all of their work-related activities after they arrive at their first call and before they leave their last call. (Declaration of John Wills ("Wills Decl."), Ex. B to Def. Opp., at ¶ 6) On this basis, service technicians' paid time generally begins when they arrive at their first service calls and ends when they complete their last calls. Some CBAs permit service technicians to report driving time to the extent it exceeds a designated period of time (usually 30 minutes). (Def. Opp. at 5) Otherwise, non-union service technicians do not receive compensation for the time spent driving to their first call or home after their last call. (*Id.*)

**Pre–Shift Computer Work**

Despite the rule that service technicians' paid work does not begin until they arrive at their first customer call, there are cer-

tain tasks they must complete beforehand. Defendant submitted declarations from CSMs stating that service technicians are instructed to begin each day by putting their computers in their vans, and logging in to get their list of calls for the day. (Declaration of Rosa Walsh ("Walsh Decl."), Ex. C to Def. Opp., at ¶ 5; Declaration of Robert Brinzer ("Brinzer Decl."), Ex. D to Def. Opp., at ¶ 5; Declaration of Chris Miller ("Miller Decl."), Ex. F to Def. Opp., at ¶ 6; Declaration of Mark Urbin ("Urbin Decl."), Ex. L to Def. Opp., at ¶ 5) CSM Rosa Walsh states that service technicians can then either remain parked or begin driving while their computers boot up. (Walsh Decl. ¶ 5) Ms. Walsh states that, after their computers boot up, service technicians make contact with their first customer by cell phone or through the computer while en route to that customer's home. (*Id.*) Other CSMs state in declarations that service technicians can boot up computers to get their list of calls at home while eating breakfast or getting ready for work. (Declaration of Bobby Nelson ("Nelson Decl."), Ex. E to Def. Opp., at ¶ 7; Declaration of Mike Andre ("Andre Decl."), Ex. J to Def. Opp., at ¶ 7; Declaration of Windy Jones ("Jones Decl."), Ex. K to Def. Opp., at ¶ 8).

Declarations from service technicians submitted by both Plaintiffs and Defendants indicate that service technicians generally log onto their computers and check their list of calls for the day before they leave their homes.[3] (Declaration of Benny Pruiett ("Pruiett Decl."), Ex. G to Def. Opp., at ¶ 6; Declaration of Dan McDermott ("McDermott Decl."), Ex. H to Def. Opp., at ¶ 6; Declarations of Lance Berg-

---

2. According to Defendant, services technicians are placed on PIPs after less formal measures do not succeed in improving performance. (*Id.*).

3. One service technician states that he performs such duties in the parking lot of a nearby grocery or gas station after he leaves his home but prior to arriving at his first call. (Declaration for Gary Wolf ("Wolf Decl."), Ex. I to Def. Opp., at ¶ 5).

man ("Bergman Decl.") ¶¶ 16–17, Anthony Chelpaty ("Chelpaty Decl.") ¶¶ 16–17, Kurt Frederick ("Frederick Decl.") ¶¶ 16–17, David Leppo ("Leppo Decl.") ¶¶ 16–17, Donald Maddy ("Maddy Decl.") ¶¶ 16–17, and Jacob Walters ("Walters Decl.") ¶¶ 16–17, all attached as Ex. B to P.M.L.) [4.] These service technicians also state that, upon logging into their computers, they also check to see if there are any issues with the parts they will need during the day's calls. (*Id.*)

In the declarations Plaintiffs submitted, service technicians state that it takes approximately 10–15 minutes to boot up and log into their computers, and another 15–30 minutes to check their call lists, read emails and call their first customers prior to heading out for the day. (*Id.*) Gary Wolfe, a service technician who submitted a declaration on behalf of Defendants, also admits that it takes 10–15 minutes to boot up and get his list of calls. (Wolfe Decl. ¶ 5) Declarations from CSMs acknowledge that service technicians' laptops need "several minutes" to boot up. (Nelson Decl. ¶ 7; Andre Decl. ¶ 7).

Plaintiffs claim that CSMs knew service technicians spent time organizing their days before leaving for their first calls. Plaintiffs Lance Bergman and David Leppo, both of whom work as service technicians in Florida, state in their declarations that, in December 2013, their new regional manager John Wills told them they could no longer check email and parts needs before leaving home for their first call. (Bergman Decl. ¶ 20; Leppo Decl. ¶ 20) According to former California service technician Bradley Palmer, his CSM Vince Guida told him that in annual meetings, attended by all CSMs, the CSMs "knew and discussed" the time service technicians spent on their computers organizing their days. (Palmer Decl. ¶ 19).

**Working Through Lunch**

Plaintiffs also state that they often work through their lunch period to meet the RPD goals, even though Defendant automatically deducts a 30–minute lunch from employee pay. (P.S.F. ¶ 26) Plaintiffs are required to report whether or not they actually take lunch, but Plaintiffs claim that they do not note on their time logs that they regularly work through lunch because, if the lunch time were factored into their total hours worked, their RPDs would be lower. (*Id.* ¶¶ 26–27) Plaintiffs state that when service technicians report that they miss a lunch break, CSMs tell them that they must take lunch. (*Id.* ¶ 28) Plaintiffs vary in the number of days each week that they claim to work through lunch without notifying CSMs. (*See, e.g.,* Bergman Decl. ¶ 27 (4–5 days); Frederick Decl. ¶ 26 (3–4 days); Leppo Decl. ¶ 27 (2–4 days); Maddy Decl. ¶ 26 (1–2 days)).

Defendant states that the only nationwide policy is that service technicians must report if they do not take their lunch so that they can be paid for the time spent working. (Def. Opp. at 7) Otherwise, lunch practices vary across different zones. (*Id.*) For example, in four of CSM Rosa Walsh's zones, service technicians are free to decide whether or not to take a lunch break according to a letter of understanding between Defendant and the union representing these technicians. (Walsh Decl. ¶ 12).

---

4. Plaintiffs also submitted additional declarations in their reply papers from service technicians Juan Ramos, Thomas Kiss, Bradley Palmer, William Madden, Jeffrey Navarette, and Steve Le Blanc, each of whom also claims their general practice to be logging into their computers and checking calls from home prior to leaving for their first call. (Plaintiff's Reply Memorandum ("P.R.M."), at Exs. A–1 through A–6).

**Post–Shift Work**

On top of work performed before their first calls and during lunch time, Plaintiffs state that, after returning home from their last calls of the day, service technicians use their laptops to check calls for the following day, read and respond to emails, and review lists of parts needed. (P.S.F. ¶ 31–32) The amount of time Plaintiffs spend on this work ranges from 30 minutes one day each week (LeBlanc Decl. ¶ 30), to 30–60 minutes every day of the week (Walters Decl. ¶ 30). Plaintiffs state that they were not compensated for post-shift work. (P.S.F. ¶ 32).

Part of service technicians' post-shift computer use was apparently spent using a program called "Crystal Ball," which let them perform certain parts management functions.[5] (Def. Opp. at 11) Benny Pruiett, a service technician who submitted a declaration on behalf of Defendant, states that he used Crystal Ball while watching television and that he did not consider it as work. (Pruiett Decl. ¶ 13) Dan McDermott, another service technician who submitted a declaration for Defendant, states that it usually took no longer than five minutes each evening to look for parts. (McDermott Decl. ¶ 8) In May 2014, Defendant adjusted Crystal Ball to eliminate off-hours usage by restricting access to the program outside 7:00 a.m. to 6:00 p.m. during the week and 8:00 a.m. to 1:00 p.m. on Saturdays. (Def. Opp. at 12; Mathers Decl. ¶ 17).

**Other Unpaid Work**

Plaintiffs state that service technicians were not paid for additional "off the clock" work, including accepting and organizing shipments of new parts, and vehicle maintenance. (P.S.F. ¶¶ 33–35) According to Defendant, service technicians receive shipments of new parts each week in plastic totes and are instructed to place the totes inside their vans and to unpack the totes during the work day only, i.e. between their first and last calls. (Def. Opp. at 4–5) Some Plaintiffs claim to have spent around one and one-half hours each week unpacking and organizing parts deliveries. (Decls. of Bergman ¶ 30; Walters ¶¶ 32–33; Frederick ¶ 32; Leppo ¶¶ 34–35; Ramos ¶¶ 34–35; Palmer ¶¶ 36–38; and Navarette ¶¶ 28–29) These Plaintiffs state that they dealt with these deliveries "off the clock" both to avoid recording work hours in which they were not bringing in revenue, and to make the work day more efficient, thereby increasing their RPD. (Id.) Defendants acknowledge that, from time to time, technicians are too busy with service calls to handle parts deliveries during the normal work day. (Def. Opp. at 5) However, Defendants state that technicians can ask permission for overtime in these situations. (Id.)

**Procedural Background**

On January 23, 2014, Plaintiffs filed suit against Defendant individually and on behalf of others similarly situated. Plaintiffs have since amended their Complaint twice, once on May 29, 2014, and again on November 7, 2014. In their Second Amended Complaint, Plaintiffs assert claims under the Fair Labor Standard Act, 29 U.S.C. § 201 et seq. ("FLSA"), and the wage and hour laws of multiple states, including New Jersey, Pennsylvania, Massachusetts, Florida, Maryland, New York, Rhode Island, Michigan, California, and Illinois. (Second Amen. Compl. ¶¶ 1–12).

Plaintiffs filed the instant motion to conditionally certify the lawsuit as a collective action on June 6, 2014. In support of their

---

**5.** Plaintiffs do not refer to this program by name, but CSMs and service technicians who submitted declarations on behalf of Defen-

dants state that service technicians occasionally used Crystal Ball outside normal working hours for this purpose. (Def. Opp. at 12).

motion, Plaintiffs have submitted declarations from twelve service technicians who work for eight of the 20 CSMs in various zones across the country. None of the named plaintiffs are subject to the arbitration agreements. (Nov. 12, 2014 Letter from Plaintiffs' Counsel, Docket No. 64) At the time Plaintiffs submitted their reply to Defendant's opposition papers on July 17, 2014, 68 plaintiffs from 13 states had opted into the lawsuit. (P.R.M. at 14) Discovery is ongoing. At this point, there are 100 named and opt-in Plaintiffs. (Oct. 31, 2014 Letter from Plaintiffs' Counsel, Docket No. 54).

## II. REQUIREMENTS FOR CONDITIONAL CERTIFICATION

Under the FLSA, employers must pay overtime compensation for an employee's work in excess of 40 hours per week. 29 U.S.C. § 207. Employees who feel their right to overtime compensation has been violated may bring an action on behalf of themselves and "other employees similarly situated." *Id.* § 216(b). To become parties to a collective action, employees must affirmatively opt into a case. *Id.*

■ The FLSA does not define the term "similarly situated." As a result, courts in the Third Circuit follow a two-step process for deciding whether an action may properly proceed as a collective action under the FLSA. *Camesi v. Univ. of Pittsburgh Med. Ctr.*, 729 F.3d 239, 243 (3d Cir.2013) As a first step, "[a]pplying a 'fairly lenient standard' ... the court makes a preliminary determination as to whether the named plaintiffs have made a 'modest factual showing' that the employees identified in their complaint are 'similarly situated.'" *Id.* (citing *Zavala v. Wal Mart Stores, Inc.*, 691 F.3d 527, 536 (3d Cir.2012)). "If the plaintiffs have satisfied their burden, the court will 'conditionally certify' the collective action for the purpose of facilitating notice to potential opt-in plaintiffs and conducting pre-trial discovery." *Camesi*, 729 F.3d at 243. This "notice stage" occurs "early in the litigation when the court has minimal evidence." *Adami v. Cardo Windows, Inc.*, 299 F.R.D. 68, 78 (D.N.J.2014).

■ As a second step, courts make "a conclusive determination as to whether each plaintiff who has opted in to the collective action is in fact similarly situated to the named plaintiffs." *Symczyk v. Genesis Healthcare Corp.*, 656 F.3d 189, 193 (3d Cir.2011), *rev'd on other grounds*, *Genesis Healthcare Corp. v. Symczyk*, —— U.S. ——, 133 S.Ct. 1523, 1527, 185 L.Ed.2d 636 (2013). At this "final certification" step, which occurs after further discovery, plaintiffs must establish by a preponderance of the evidence that named plaintiffs and opt-ins are similarly situated. *Adami*, 299 F.R.D. at 78.

The "modest factual showing" Plaintiffs must make here at the first step in the process requires them to "produce some evidence, beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected [them] and the manner in which it affected other employees." *Symczyk*, 656 F.3d at 193 (internal quotations omitted). Courts in this Circuit consider all relevant factors and make a factual determination on a case-by-case basis. *Zavala*, 691 F.3d at 536. Courts do not assess the merits of plaintiffs' underlying claims at this stage. *Goodman v. Burlington Coat Factory*, No. 11–4395(JHR), 2012 WL 5944000, at *5 (D.N.J. Nov. 20, 2012). "A showing that opt-in plaintiffs bring the same claims and seek the same form of relief has been considered sufficient for conditional certification." *Pearsall–Dineen v. Freedom Mort. Corp.*, 27 F.Supp.3d 567, 538–39, No. 13–6836, 2014 WL 2873878, at *2 (D.N.J. June 25, 2014).

 Relevant factors include "whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." *Zavala*, 691 F.3d at 536–37. "Plaintiffs may also be found dissimilar based on the existence of individualized defenses." *Id.* at 537. Finally, "courts consider whether collective treatment will achieve the primary objectives of a § 216(b) collective action," i.e. (1) lowering costs to plaintiffs through pooling resources; and (2) resolving common issues of law and fact that arose from the same alleged activity in one efficient proceeding. *Adami*, 299 F.R.D. at 78–79.

## III. ANALYSIS

Plaintiffs ask this Court to conditionally certify Plaintiffs' FLSA claims as a collective action and approve notice to the following similarly situated plaintiffs: "Named Plaintiffs, 'opt-in' Plaintiffs and all other individuals who worked for Defendant in the United States as service technicians in the General Electric Consumer Home Service from January 2011 to the present." (P.M.L. at 2).

Plaintiffs allege two nationwide policies or procedures instituted by Defendant that affected named Plaintiffs and all other service technicians: (1) all service technicians are required to perform the same required pre-shift computer work off the clock and without payment; (2) Defendant's RPD and PIP policies require and encourage service technicians to perform work-related duties off the clock without compensation. Plaintiffs provide factual support for these allegations in declarations from twelve service technicians who work under eight CSMs.

## Pre–Shift Computer Work

 In regards to the unpaid pre-shift computer use policy, service technicians who submitted declarations on behalf of Plaintiffs all state that they are instructed to log into their computers each morning before arriving at their first calls, but are also instructed not to perform any work-related activities until they arrive at those calls. Defendants downplay the scope of the work service technicians must do before their first calls, but admit that service technicians must begin each day by logging into their computers and checking their calls for the day. That Plaintiffs are similarly situated to all other service technicians in regards to this policy is clear— each must access his list of calls for the day before he can arrive at the first call.

Defendant argues that there is no policy in place requiring service technicians to do any pre-shift computer work, and that such work is not necessary. Defendant submitted declarations from CSMs stating that they instruct service technicians to place laptops in their vans, log in (which takes only a few second), and make contact with their first client while en route to that call. (Walsh Decl. ¶ 5; Brinzer Decl. ¶ 5; Miller Decl. ¶ 6; Urbin Decl. ¶ 5) Out of these CSMs, only Rosa Walsh acknowledges the time it takes for computers to boot up and she states that technicians can wait in their car or begin driving while their computers boot up. (Walsh Decl. ¶ 5).

Yet, Defendant does not explain how a service technician can begin driving toward his first call before knowing the location of this call and whether the client is home. It is clear that some unpaid work-related activity must necessarily occur before service technicians arrive at their first calls and that all service technicians across all zones are similarly situated in this regard. Whether or not this activity actually

satisfies the elements of a claim under the FLSA is a merits question and thus inappropriate at this conditional certification stage. However, Plaintiff has provided sufficient evidence for conditional certification as related to pre-shift computer work.

**Other Off–the–Clock Work**

Plaintiffs allege that they perform other work off the clock without compensation as well. Declarations from Plaintiff service technicians state that the only way for them to meet Defendant's stringent RPD goals is to (1) work through lunch, even though lunch time is automatically deducted from paid time, (2) unpack and organize parts deliveries off the clock, (3) log into their computers after work in order to check on parts needed for future calls, and (4) take their work-issued vans for maintenance multiple times each year without recording time spent doing so. Plaintiffs do not allege that they were denied overtime when they recorded overtime hours worked, but that the effect overtime would have on their RPD forced them, and all other service technicians, to perform work off the clock, and that Defendant knew or should have known they were doing so.

Defendant makes two primary arguments against Plaintiffs' assertion that all service technicians are similarly situated in regards to this alleged policy. First and foremost, Defendant asserts that there is no actual "policy" to begin with that requires off-the-clock work. Second, Defendant argues the declarations from certain service technicians who present their individual experiences do not warrant nationwide certification.

In arguing there to be no policy in place that violates the FLSA, Defendant suggests that, for conditional certification to be proper, Plaintiffs must present evidence of an actual policy that requires or encourages all service technicians to work off the clock. Defendant points out that GE Consumer Home Service technicians are actually required to report their time accurately. (Def. Opp. at 9) Further, Defendant emphasizes that its RPD requirements do not violate the FLSA and that Plaintiffs have not provided evidence that Defendant knew or should have known that Plaintiffs were working overtime without compensation.

In making these points, Defendant strays from the limited question at issue in this initial conditional certification stage and asks this Court to consider the merits of Plaintiffs' FLSA claims. At this step in the litigation, Plaintiffs must only allege a policy and present facts showing that the alleged policy affected them and all other service technicians similarly. That policy need not be written. Courts in this Circuit have conditionally certified collective actions in many cases where plaintiffs allege that an unwritten policy or practice led to off-the-clock work, particularly where that unwritten policy related to certain time-based goals set by employers. *See, e.g., Vargas v. General Nutrition Ctrs., Inc.,* No. 2:10–cv–867, 2012 WL 3544733, at *8 (W.D.Pa. Aug. 16, 2012) ("An unwritten policy or practice resulting in unpaid overtime, such as making management pay dependent upon meeting hours targets may be actionable under the FLSA."); *Steinberg v. TD Bank, N.A.,* No. 10–cv–5600 (RMB–JS), 2012 WL 2500331, at *8 (D.N.J. June 27, 2012) ("Contrary to Defendant's contention, a written policy is not required, and an unwritten but company-wide policy, as Plaintiffs offer here, is sufficient even where the unofficial policy is contrary to the official written policy"); *Sabol v. Apollo Group, Inc.,* No. 09–cv–3439, 2010 WL 1956591 (E.D.Pa. May 12, 2010) (conditionally certifying a collective action of enrollment counselors at a university even though the defendant's official policy was to pay overtime when plaintiffs

alleged that they worked off-the-clock to meet enrollment goals set by management); *Pereira v. Foot Locker, Inc.*, 261 F.R.D. 60 (E.D.Pa.2009) (conditionally certifying collective action where plaintiffs alleged that the hours budget allotted for certain employees at defendant's stores was inadequate for employees to perform all their duties without off-the-clock work, even though defendant's policies were explicitly against such work).

■ Here, Plaintiffs make a similar allegation to those made in *Vargas, Sabol,* and *Pereira*—Plaintiffs claim that Defendant's RPD requirements, in their effect, constitute an unwritten policy encouraging service technicians not to report overtime hours, and that Defendant knew or should have known that service technicians worked off the clock. To show that they are similarly situated to all other service technicians in regards to this policy, Plaintiffs point to (1) the fact that all service technicians must meet RPD requirements or face potential adverse employment actions, (2) declarations from 12 service technicians working for eight of twenty CSMs who all state that they work off the clock consistently in order to meet stringent RPD requirements and that their CSMs knew about such work, (3) the declaration of service technician Bradley Palmer, who states that his CSM told him that at annual meetings, CSMs discussed service technicians' off-the-clock work (Palmer Decl. ¶ 19), (4) Defendant's ability to track all service technicians off-the-clock work through the GPS sensors in their vans and their computer log-in times, and (5) the fact that over 80 more service technicians from multiple states have since opted into the lawsuit.

Arguing that Plaintiffs have not presented enough evidence for conditional certification, Defendant also relies on a very similar FLSA case brought by a GE Consumer Home Services technician in the United States District Court for the Western District of Missouri, where the court rejected the plaintiff's request for conditional certification. *Settles v. General Electric,* No. 12–00602–CV–W–BP, 2013 U.S. Dist. LEXIS 187008 (W.D.Mo. Feb. 19, 2013). In *Settles,* a single named plaintiff brought a claim on behalf of himself and all other service technicians for unpaid overtime. He made similar allegations to those Plaintiffs make here—namely, that service technicians performed certain tasks off the clock in order to meet RPD goals.[6] *Id.* at *7–10. The court held that conditional certification was improper because the plaintiff did not provide evidence that any managers knew about or facilitated illegal overtime practices and therefore failed to establish that all service technicians were victims of a single decision, policy or plan. *Id.* at *10.

First, the *Settles* opinion is not binding on this Court. Second, plaintiff in that case submitted only his own declaration and declarations from one former service technician and one former dispatcher. Here, we have ten named Plaintiffs who have submitted 12 declarations from service technicians. In addition, as outlined above, Plaintiffs have presented evidence that CSMs knew or should have known about service technicians' off-the-clock work. This Court will not rely on the *Settles* decision.

There are certainly differences between Plaintiffs and proposed collective action members. As Defendant points out, RPD

---

**6.** Significantly, as far as this Court can tell from the *Settles* opinion, the plaintiff did not raise the time spent logging into his computer each morning to check his list of calls. For this reason, this Court finds *Settles* irrelevant to the above discussion of that policy in the present case.

requirements vary across different zones, each of which is "like its own little business." (Wills Decl. ¶ 2). The procedures for obtaining approval for overtime vary across different CSMs. Plaintiffs ' themselves vary in the amount of time they spend off-the-clock performing the tasks discussed above. The declarations Plaintiffs submitted generally discuss individual experiences and do not state that technicians have observed or spoken to others who have worked off the clock to make RPD requirements. Last, some service technicians, though none of the named Plaintiffs, signed arbitration agreements with Defendant.

However, Plaintiffs and the service technicians to whom they want to facilitate notice all work in the same GE Consumer Home Services business segment and share similar circumstances of employment. Common issues of law and fact arise from their collective experiences, and they seek the same relief. Plaintiffs' declarations demonstrate that all service technicians must find time to check on parts orders, organize parts deliveries, and service their vans while meeting challenging revenue goals. Plaintiffs have presented evidence that CSMs could track techni-

cians' off-the-clock work, and knew enough about off-the-clock work to change procedures and limit access to Crystal Ball in the evening. That Plaintiffs have submitted declarations from service technicians in nine states who have worked for eight different CSMs provides sufficient evidence that service technicians across the United States, not just in a few individual zones, are affected similarly by the RPD goals.

Defendant's arguments against certification, specifically the individual questions that arise regarding particular zones and service technicians, may win the day when this Court considers final certification. But, at this stage, such concerns are premature.[7] *See Steinberg*, 2012 WL 2500331, at *8 ("[I]ssues of individualized proof and defenses are more appropriately addressed at the second stage of certification."); *Bishop v. AT & T Corp.*, 256 F.R.D. 503 (W.D.Pa.2009) (finding defendant's argument that plaintiffs' claims were too individualized to be a stage two inquiry). This Court therefore holds that Plaintiffs have made the modest factual showing necessary to satisfy the lenient standard for conditional certification.

---

**7.** It is appropriate here to outline the procedure this Court will use with regards to service technicians who signed arbitration agreements pursuant to GE's Solutions Program. That some service technicians have signed arbitration agreements does not preclude conditional certification of all service technicians across the United States. Opt-in Plaintiffs subject to such agreements do not themselves bring claims on behalf of those similarly situated. However, at the final certification stage, if this Court grants certification, this Court may create two separate groups: (1) union service technicians who have not signed arbitration agreements, and (2) non-union service technicians subject to GE's Solutions Program. The union service technicians' claims will proceed to trial first, and, barring any challenges to the validity of the arbitration agreements, this Court will stay

the arbitration of individual non-union service technicians' claims. Following the disposition of union service technicians' claims, individual non-union service technicians may arbitrate their individual claims pursuant to the Solutions Program. At that point, this Court will consider any relevant issues regarding claim or issue preclusion.

This procedure acknowledges the inherent similarities in all potential Plaintiffs' claims, whether or not they are subject to arbitration agreements, but also maintains the integrity of the arbitration agreements certain service technicians have signed. It also constitutes the most efficient use of this Court's and the parties' resources. Plaintiff's counsel may even represent both union service technicians at the initial trial and non-union technicians at the subsequent individual arbitrations.

## IV.

For the reasons set forth above, the Court will **GRANT** Plaintiffs' Motion for Conditional Class Action Certification. An appropriate Order accompanies this Opinion.

## ORDER

This matter having appeared before the Court upon Plaintiffs' Motion to Conditionally Certify as a Collective Action, the Court having considered the submissions of the parties, and for the reasons set forth in the accompanying Opinion issued on even date herewith, which findings of fact and conclusions of law are incorporated herein by reference, and for good cause appearing;

**IT IS** on this 14th day of November, 2014, **ORDERED THAT:**

(1) Plaintiffs' Motion to Conditionally Certify as a Collective Action (Docket # 34) is hereby **GRANTED.**

(2) The parties are directed to confer on proposed notice to potential opt-in plaintiffs, and to file a joint submission regarding notice and opt-in procedure within 20 days of this Order.[1]

(3) Defendant shall provide Plaintiffs with a list of all putative members of the collective action (including services technicians who have signed arbitration agreements pursuant to the GE Solutions Program), along with their most recent home and e-mail addresses, within 20 days of this Order.

---

**1.** This notice may include the procedure, detailed in this Court's accompanying Opinion, by which union and non-union service technicians will proceed upon final certification.